UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
OFFICE OF HEARINGS AND APPEALS

In the Matter of:

**Associated Mortgage Bankers,**

Petitioner.

15- VH-0026-AO-009

7-207084340A

December 16, 2016

## DECISION AND ORDER

On October 13, 2014, Associated Mortgage Bankers ("Petitioner") was notified pursuant to 31 U.S.C. §§ 3716 and 3720A, that the Secretary of the U.S. Department of Housing and Urban Development ("HUD" or "Secretary") intended to seek administrative offset of any federal payments to Petitioner in satisfaction of a debt allegedly owed to HUD. This case is before the Office of Hearings and Appeals upon a *Request for Hearing* ("*Hr'g. Req.*") filed by Associated Mortgage Bankers ("Petitioner"), on December 17, 2014, concerning the existence, amount, or enforceability of a debt allegedly owed HUD.

Pursuant to 24 C.F.R. §17.81(a), on December 17, 2014, this Court stayed the issuance of an administrative offset of any federal payment due Petitioner until the issuance of this written decision. *Notice of Docketing, Order, and Stay of Referral* ("*Notice of Docketing*"), 2. On January 16, 2015, Petitioner filed a *Supplemental Submission in Support of Its Appeal* ("*Pet'r's. Supp. Stat.*"). The Secretary responded with his *Secretary's Statement* ("*Sec'y. Stat.*") on March 9, 2015. The Court issued an *Order for Clarification* on August 3, 2015, to which the Secretary responded with a *Supplemental Secretary's Statement* ("*Sec'y. Supp. Stat.*") on September 3, 2015.

A *Second Order for Clarification* was issued on January 28, 2016, again seeking additional information from the Secretary. A *Second Supplemental Secretary's Statement* ("*Second Sec'y. Supp. Stat.*") was filed on March 16, 2016. Petitioner filed its response on April 26, 2016. On May 25, 2016, Petitioner filed a *Notice of Recent Decision*, to which the Secretary filed a Secretary's Rebuttal to Petitioner's Notice of Decision on June 17, 2016. Finally, on June 24, 2016, Petitioner filed his *Response to the Secretary's Rebuttal to the Notice of Recent Decision*. This case is now ripe for review.

## JURISDICTION

The Office of Hearings and Appeals has jurisdiction to determine whether Petitioner's debt is past due and legally enforceable pursuant to 24 C.F.R. §§ 17.61 *et seq.* The administrative judges of this Court, in accordance with the procedures set forth in 24 C.F.R. §§ 17.69 and 17.73, have been designated to conduct a hearing to determine, by a preponderance of the evidence, whether the alleged debt is past due and legally enforceable.

**EXHIBIT F**

## BACKGROUND

During a September 2012 review of Petitioner's mortgage finance operation, HUD's Quality Assurance Division discovered that Petitioner had engaged in "non-compliant lending activities" with regard to FHA Case Number 374-5838647 ("the Springer Loan"). *Sec'y. Stat.*, ¶¶ 2-3; Ex. A, Declaration of Brian Dillon[1] (*"Dillon Decl."*), ¶ 4. Those activities increased the risk of default on the Springer Loan, and correspondingly increased the risk that HUD would be obligated to pay a mortgage insurance claim upon default. *Sec'y. Stat.*, ¶ 3. On December 10, 2012, Petitioner and HUD signed an Indemnification Agreement ("Agreement") in which Petitioner agreed to indemnify HUD — until October 19, 2015[2] — for any losses that HUD incurred as insurer of the Springer Loan. *Sec'y. Stat.*, ¶3; *Dillon Decl.*, p. 4.

The Springer Loan went into default on November 1, 2011. *Sec'y. Stat.*, ¶ 6. The mortgage's servicer, JPMorgan Chase Bank ("Chase Bank") filed a claim for mortgage insurance on August 6, 2013. *Id.*, at ¶ 7. On August 10, 2013, HUD paid an insurance claim of $520,979.86 to Chase Bank. *Id.* On September 19, 2013, HUD sold the Springer Loan via its Single Family Loan Sale ("SFLS") Program for $360,531.24. *Id.*, at ¶ 8. On July 28, 2014, HUD sent Petitioner a Demand Notice seeking payment of $160,448.62, representing the difference between the amount of the insurance claim and the proceeds from the sale of the loan. Petitioner has not tendered any payment in response to the Demand Notice.

The Secretary asserts that Petitioner is indebted to HUD in the following amounts:

(a) $160,448.62 as the unpaid principal balance as of February 25, 2015;
(b) $4,680.30 as the unpaid interest on the principal balance at 5% per annum through February 23, 2015;
(c) $9,753.95 as unpaid penalties as of February 25, 2015;
(d) $35.33 as unpaid administrative costs as of February 25, 2015; and
(e) interest on the principal balance from February 25, 2015; at 5% per annum until paid.

*Sec'y. Stat.*, ¶ 11.

Accordingly, on October 13, 2014, HUD sent Petitioner a Notice of Intent to Collect via Treasury Offset. Petitioner's request for a hearing followed in due course.

## DISCUSSION

The underlying facts of this case are not in dispute. The parties agree that the Springer Loan [FHA Case Number 374-5838647] was at high risk of default due to Petitioner's improper lending activities. In order to resolve these findings, Petitioner entered into an indemnification agreement in which he promised to indemnify HUD for its losses in the event of a default on the subject loan, instead of being subjected to other available administrative actions for non-compliant lending activities. *Sec'y. Stat.*, Exhibit A, *Dillon Decl.*, ¶ 4. In this case, the high risk loan was in

---

[1] Brian Dillon is the Director of the Asset Recovery Division of HUD's Financial Operations Center.

[2] The Indemnification Agreement stated that it applied "through and up to five years from the loan's date of endorsement." The loan was endorsed for insurance by FHA/HUD on October 19, 2010.

2

default in less than 18 months. As noted previously, Chase Bank filed a claim for mortgage insurance and HUD made a payment of $520,979.86 to Chase Bank, of which only $360,531.24 was able to be recovered. The record indicates that of the $520,979.86, the current balance remaining, $160,448.62, is still owed by Petitioner. As a result, the jurisdictional basis for this hearing is to determine, by a preponderance of the evidence, whether the alleged debt of $160,448.62 is past due and legally enforceable.

Petitioner, through counsel, challenges the amount of the alleged debt and, in general, claims that he is not obligated to honor the terms of the Indemnification Agreement because: 1) the mortgage insurance claim paid by J.P. Morgan Chase Bank to HUD was not a valid insurance claim because the subsequent sale of the Note was improperly handled; 2) HUD breached the Indemnification Agreement by negligently selling the Springer Loan through the SFLS Program; 3) HUD acted in contravention of its internal guidance; and, 4) the sale of the Springer Loan through the SFLS Program violated the implied covenants of good faith and fair dealing in the Indemnification Agreement.

### I.      The Insurance Claim is Valid.

The basis for Petitioner's claim that HUD's insurance claim is not valid is first, the amount of the alleged debt claimed by the Secretary was miscalculated because HUD failed to sell the property at market value as the Indemnification Agreement required, and failed to maximize HUD's potential return in order to minimize the corresponding indemnification claim; and, second, even if selling the loan rather than the property was appropriate, HUD still erred by including the loan as part of a pool that subsequently lowered further the potential market value of the loan sold.

In support of his position, Petitioner introduced into evidence copies of a Broker Price Opinion valuation from Chase Bank; an online valuation report listing the property's value as of September 2013; HUD's valuation of the property on its Neighborhood Watch Early Warning System as of September 2010; a copy of a letter from the Director of the Asset Recovery Division of HUD's Financial Operations Center regarding the loan; the Single Family Loan Sale (SFLS) Sales Results Summary 2013; and, a copy of the Participating Service Agreement (PSA) between HUD and Chase Bank. There is no indication from the record that Petitioner was a party to the PSA.

In response, the Secretary argues that "the Indemnification Agreement permits HUD to sell the Note instead of the property" and, as a result, is a valid insurance claim that permits HUD to recoup the losses incurred. *Sec'y. Stat.* ¶ 20. As a result, the Secretary claims that he was under no contractual obligation to sell at market value even though the loans, by competitive bid, ultimately sold at market value anyway through the SFLS Program. *Id.* The Secretary introduced into evidence, for the Court's review, copies of the Indemnification Agreement between HUD and Petitioner, HUD's valuation of the property on its own Neighborhood Watch Early Warning System as of January 2015, and, an affidavit from the Director of the Assets Sales Office for HUD's Federal Housing Administration (FHA), along with supporting documentation that included copies of a case activity report that reflected the sales price of the property that was the subject of the loan, and the demand notice to Petitioner that demanded payment of the alleged debt in the amount claimed by the Secretary.

3

At the outset the Court first will address the fundamentals — the Agreement is a basic contract. Where parties have expressly contracted with respect to the duty to indemnify, the extent of the duty must be determined from the language of the contract. 41 Am. Jur. 2d Indemnity § 29 (2016). The nature of the indemnity stated in the contract will determine not only when a right of action accrues but also the measure of damages that may be recovered. Id. A court will construe an indemnity agreement to cover all losses and damages to which it reasonably appears the parties intended it to apply. Id. A party is entitled to full contractual indemnification provided that the intention to indemnify can be clearly implied from the language and purposes of the entire agreement, and the surrounding facts and circumstances. Torres v. Morse Diesel Int'l, Inc., 788 N.Y.S.2d 97, 98 (2005) (citing Drzewinski v. Atl. Scaffold & Ladder Co., 515 N.E.2d 902, 904 (1987)). An indemnity contract will not be extended to include losses, damages, or liabilities which are not expressly within the terms of the contract and which are not of such character that it can be reasonably inferred that they were intended to be within the terms of the contract. 41 Am. Jur. 2d Indemnity § 29 (2016).

After reviewing the Agreement herein, there is no language in the Agreement that identifies how the loan is to be sold, by whom, or under what restrictive perimeters should such note, or property, be sold by HUD in order to recoup the alleged debt. The terms of the Agreement likewise do not expressly require HUD to sell the property in order for there to be a valid insurance claim. In fact, the language in the Agreement is practically unrestrictive, particularly with respect to the provisions at paragraph I(d) in which it states, "In any other case where a HUD/FHA insurance claim is pending or has been paid, the mortgagee shall pay HUD the amount of HUD's investment in accordance with the terms of an invoice or bill the Department sends to the Mortgagee."

In this case, HUD, within its discretion, chose to proceed via ¶ I(d). It is unclear why HUD chose this course of action given that selling the property may have likely yielded a superior recovery. But, how HUD handled the matter of recouping its losses, and why HUD chose in this case to proceed as it did is immaterial and irrelevant to the disposition of the case at hand. According to the terms of the Indemnification Agreement, the decisions to sell the Springer Loan and to determine the manner in which the loan should be sold, are completely within HUD's discretion. As a result, Petitioner's assertion that ¶ I(c)[3] must apply lacks merit and is unpersuasive.

Moreover, the language in the Agreement specifically states:

> In the event of a valid claim for insurance ... **indemnification will be in accordance with paragraph (b), (c), (d), or (e), whichever applies**. HUD's Investment includes, but is not limited to: the full amount of the insurance claim actually paid, all taxes and assessments paid or payable by HUD, all maintenance and operating expenses paid or payable by HUD (including costs of rehabilitation and preservation), loss mitigation, **prorated losses from and expenses associated with the sale of a note**, reasonable penalties

---

[3] Paragraph I(c) reads, in part: Where a HUD/FHA insurance claim has been paid in full and the property has been sold by HUD to a third party, the amount of indemnification is HUD's Investment ... minus the sales price of the property ...."

4

> for failure to pay amounts owed within the time frame established by HUD invoices.... To the extent HUD recoups any losses (e.g., receipts for the sale of the property) ... HUD will deduct the amount of the recoupment or discount from HUD's Investment.

Agreement, ¶ I(a) (emphases added).

The description of the HUD Investment explicitly references, as a basis for recouping HUD's costs, expenses "associated with the sale of a note." The Indemnification Agreement further contemplates three equally valid scenarios for determining the indemnification amount, all of which are options to be employed at HUD's discretion. HUD may reconvey the property directly to the mortgagee under ¶ I(b),[4] sell the property to a third party and deduct the sales price from the total investment under ¶ I(c),[5] or pay the claim and seek full payment of the investment from the mortgagee under ¶ I(d).[6] Only in ¶ I(c) is the actual property sold, and hence only under that paragraph is the market value of the property a relevant consideration. HUD not only has the discretion to elect when a valid insurance claim is warranted, but it also has the discretion on how to recoup losses incurred once a valid insurance claim has been established.

It is evident that, prior to the parties reaching an agreement, they had the option to consider and perhaps negotiate the matters now raised by Petitioner. Nevertheless, once the parties duly executed and signed this Agreement, it became binding.[7] The terms of the Agreement that address how to establish what should be considered a valid insurance claim; how such losses, if incurred, should be recouped; and also, the manner in which recovery shall be handled, are all terms of the Agreement that are considered binding upon execution, unless the parties to the Agreement negotiate otherwise prior to executing the contract. A written contract, in this case the Indemnification Agreement, is the highest evidence of the terms of an agreement between two parties; "it is the duty of every contracting party to learn and know its contents before he signs and delivers it." Chicago, St. P., M. & O Ry. Co. v. Belliwith, 83 F. 437, 439 (8th Cir. 1897). As such, "If the parties have shown in the four corners of the contract that they have reached an agreement to all material terms, a party's misgivings about other terms 'do not constitute grounds for relieving a party of this obligations to comply' with the agreement." Williams v. WMATA, 537 F. Supp. 2d 220, 222 (D.D.C. 2008). Petitioner's contention that HUD's insurance claim is not valid because HUD failed to properly handle the subsequent sale of the Note is unpersuasive and lacks merit. Therefore, the Court finds not only that HUD's insurance claim is valid, but further finds that Petitioner remains contractually obligated to abide by the terms of the Agreement.

---

[4] Paragraph I(b) reads, in part: HUD may, at its option, reconvey property securing a mortgage listed in this Indemnification Agreement to the Mortgagee. In the event of a reconveyance, Mortgagee remains liable for HUD's Investment..."

[5] Paragraph I(c) reads, in part: Where a HUD/FHA insurance claim has been paid in full and the property has been sold by HUD to a third party, the amount of indemnification is HUD's Investment ... minus the sales price of the property ...."

[6] Paragraph I(d) reads, in its entirety: In any other case where a HUD/FHA insurance claim is pending or has been paid, the mortgagee shall pay HUD the amount of HUD's Investment.

[7] The Agreement, effective December 10, 2012 and signed by both parties herein states, "Wherefore the parties hereto have duly executed this Indemnification Agreement, effective when signed and dated by the U.S. Department of Housing and Urban Development."

## II. HUD Did Not Breach the Indemnification Agreement by Negligently Including the Springer Loan in the SFLS Program.

Petitioner states that HUD breached the Indemnification Agreement by negligently selling the Springer Loan through the SFLS Program. Petitioner's primary support for this argument is his reliance on the Participating Servicer Agreement ("PSA") between HUD and Chase Bank. The PSA, executed on May 22, 2013, outlines the terms by which Chase Bank may assign eligible defaulted loans to HUD for sale in the SFLS Program. The PSA specifically defines an eligible mortgage loan as one that is "not subject to an Indemnification Agreement." The Springer Loan was in fact subject to the Indemnification Agreement between Petitioner and HUD. However, Petitioner contends that the loan should not have been deemed eligible for inclusion in the SFLS Program. Petitioner claims further that it should not now be punished for HUD's negligent oversight of the SFLS Program.

Petitioner introduces as evidence a copy of a letter dated December 8, 2014 from Brian Dillon[8], to Petitioner's Counsel that confirms HUD's acknowledgement that "the indemnified loan was erroneously included in the [SFLS] Program." However, after reviewing this letter, the Court notes that the letter also concluded that the error "did not impact the legal enforceability of the Indemnification Agreement." This evidence is insufficient and falls short of meeting the burden of proof required for establishing a claim of negligence against the Secretary.

In response to Petitioner's allegation, the Secretary states that the PSA is an agreement between HUD and Chase Bank. The Secretary explains further that,

> The PSA was executed between HUD and Chase Bank on May 22, 2013, five months after execution of the Indemnification Agreement. The PSA does not specifically modify the Indemnification Agreement between HUD and Petitioner. Indeed, the PSA makes no reference whatsoever to the December 10, 2012, agreement. Chase Bank did not execute the Indemnification Agreement—Petitioner did. Therefore, no basis exists to extend the rights and obligations in the PSA to the Indemnification Agreement between HUD and Petitioner.

*Sec'y. Stat.* ¶24. "Moreover," the Secretary concludes, "there was no addendum or rider added to the Indemnification Agreement between HUD and Petitioner incorporating the PSA and making it part of the Indemnification Agreement between HUD and Petitioner." *Sec'y. Stat.* ¶25. The Secretary's argument is both compelling and persuasive.

As support, the Secretary introduces into evidence documentation that substantiates the loans sold through the SFLS Program "are competitively bid, and thus represent the loans' current market value." *Second Sec'y. Supp. Stat.*, ¶10. The Secretary introduces into evidence copies of records that explain, thoroughly, the SFLS Program's bidding process. *Second Sec'y. Supp. Stat., Attachments.* Such records include copies of a printout showing four bids for the Springer Loan. Of the four bidders, the SRMOF II 2012-1 Trust's ("SRMOF") bid of $360,531.24 most closely

---

[8] Brian Dillon is the Director of the Asset Recovery Division of HUD's Financial Operations Center.

6

matched the loan's outstanding principal balance of $491,590.76. *Id.* Also introduced into evidence were several pages of documentation purporting to be SRMOF's bids for every loan in the Lot 105 pool, and the bid for the Springer Loan was clearly among the loans listed in the records. *Id.* Based upon the evidence presented by the Secretary, the Court is persuaded that the loans in Lot 105 were included in a competitive bid, that SRMOF submitted bids on each individual loan, and that SRMOF offered the highest bid for the Springer Loan.[9] Based on the record, Petitioner has simply failed to produce sufficient evidence to successfully refute or rebut the evidence presented by the Secretary regarding the claim of negligence based on the inclusion of the Springer loan in the SFLS program.

As a general rule, a party may contract to indemnify another for its own negligence, and the agreement will be construed as "valid and enforceable, unless prohibited by statute" or grossly negligent. See 41 Am. Jur. 2d Indemnify § 16 (2016). Gross negligence differs from ordinary negligence. Gross negligence is conduct that "evidences a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." Sommer v. Federal Signal Corp., 79 N.Y. 2d 540, 554 (1992). In the instant case, the evidence presented by Petitioner does not demonstrate the level of reckless disregard required to establish the existence of gross negligence. Petitioner's claim of negligence rests squarely on HUD selling the Springer Loan through the SFLS Program. The explanation provided by the Secretary has instead convinced the Court, even more, that including the Springer Loan in the SFLS program was not evidence of HUD exercising gross negligence or exhibiting a reckless disregard for the rights of the Petitioner.

The bidding process was competitive and based on bids of each individual loan. As a result of this bidding process, SRMOF offered the highest bid for the Springer loan. While HUD acknowledged in a letter that the Springer loan should not have been included in the SFLS program, the same letter also informed Petitioner that inclusion of the Springer loan in the SFLS program did not "impact the legal enforceability of the Indemnification Agreement." *Pet'r. Response, Attachment.* The evidence submitted by Petitioner is again insufficient to support a finding of negligence or reckless disregard for Petitioner's rights. Therefore, the Court finds that HUD was not grossly negligent for including the Springer loan in the SFLS program. The Court also finds that HUD properly calculated the amount of Petitioner's indebtedness that represented the difference between the amount of the insurance claim and the proceeds from the sale of the loan.[10]

---

[9] Petitioner also argues that the SFLS Program is flawed because the winning bidder is the one who offers the highest aggregate bid, not the one who has the highest bid on the specific loan. A bidder could thus underbid on a loan but still prevail by overbidding on other loans in the same Lot. An individual loan could thus be purchased for far less than its market value. Petitioner's observation, though arguably accurate, has no bearing on the instant case. SRMOF won Lot 105 and also offered the highest bid for the Springer Loan. To the degree that "market value" can be defined as the highest price a buyer is willing to pay and a seller is willing to accept for a given item, SRMOF II has defined that value for the Springer Loan.

[10] Petitioner initially maintained that because the Springer Loan was sold in a pool, HUD could not accurately determine the sales price. Petitioner therefore could not identify the precise amount of its loss or the amount owed by Petitioner under the Indemnification Agreement. The evidence submitted along with the *Second Supplemental Secretary's Statement* effectively rebuts this contention. The evidence, including affidavits from Brian Dillon and John Lucey, Director of HUD's Asset Sales Office, all demonstrate that each loan was bid individually and made it possible to ascertain exact sale prices.

7

### III.  HUD Did Not Act in Contravention of Internal Guidance.

Petitioner claims that HUD has acted in contravention of its internal guidance and failed to abide by established policies and procedures, by including the Springer loan in the SFLS program in violation of the PSA. HUD did not breach the Indemnification Agreement by erroneously including the Springer Loan in the SFLS Program.[11] A mistake as to a collateral matter has no effect upon a contract. See 27 Williston on Contracts § 70:84. When the persons and things to which the contract relates are what the parties contemplated, then mistakes as to other collateral facts are not materially important enough to warrant rescission or reformation. Id. See also Tauber v. Tin Quan & Minto, Inc., 938 A.2d 724, 730 (D.C. 2007) (terms that were not necessary for the parties to understand how they are expected to perform the contract itself, were not material and did not undermine the binding nature of the agreement). Certain policy considerations for not allowing collateral matters to afford avoidance is that a party could make up any multitude of considerations not contemplated within the contract to escape liability. Such allowance would frustrate the fundamental purpose of contract law, making almost any contractual promise avoidable.

The Secretary's position is more convincing in this case because the error identified by Petitioner, and acknowledged by the HUD, did not impact the contractual relationship between Petitioner and the Secretary under the terms of the Indemnification Agreement. Even though the inclusion of the Springer Loan in the SFLS Program ran afoul of the PSA, the PSA again only defines the nature of the relationship between HUD and Chase Bank, not the relationship between HUD and Petitioner. Should consequences arise that are a result of a breach of the PSA, the remedies available extend only to HUD or Chase Bank. There is no evidence in the record that shows first, that those same remedies would be available to Petitioner who is not a party to the PSA; or second, shows that the Indemnification Agreement was amended to incorporate by reference the terms of the PSA. Petitioner cannot therefore seek to be protected by the PSA.

Petitioner attempts to sidestep this conclusion by asserting, without case support or elaboration, that "Petitioner, and the public, have a right to rely on the Secretary's adherence to established policies and procedures." While this may be a reasonable expectation, it is more intriguing to the Court that Petitioner has not identified the established policy upon which Petitioner relies. A PSA is neither a policy or procedure, but instead is a contract. HUD is obligated to follow promulgated regulations, even if they are not explicitly included in the terms of a contract. In re Cambridge Home Capital, LLC, HUDOA No. 06-D-NY-GG004 (June 18, 2009). That is not the case with non-promulgated regulations or guidance. Here, there is no citation to any statute, regulation, or published HUD guidance that speaks to the issues raised by Petitioner. Instead, Petitioner's argument is based entirely on the PSA to which Petitioner is not even a party. Therefore, Petitioner's claim that including the Springer loan in the SFLS program was in contravention of HUD's internal guidance lacks merit.

---

[11] The Secretary asserts that the inclusion of the Springer Loan in the SFLS pool met HUD's business objectives. This statement implies that the loan's inclusion was deliberate. This argument is without merit. The Director of the Asset Recovery Division admitted that the Springer Loan should never have been included in the SFLS Program. Including it was a direct violation of HUD's own PSA. Accordingly, even if including indemnified mortgages in the SFLS Program is generally appropriate, the Secretary cannot plausibly claim that the inclusion of the Springer Loan was a conscious choice. HUD's rationale is simply a post-hoc attempt to justify what has already been acknowledged as a mistake.

8

## IV. The Sale of the Springer Loan through the SFLS Program Did Not Violate Implied Covenants of Indemnification Agreement.

Finally, Petitioner alleges that the sale of the Springer Loan through SFLS Program violated the Indemnification Agreement's implied covenants of good faith and fair dealing. In response, the Secretary merely notes that there is no evidence of malice or improper motive. The Secretary is correct.

The government enjoys a legal presumption that it is acting in good faith when carrying out its duties. Spezzaferro v. Fed. Aviation Admin., 807 F.2d 169, 173 (Fed. Cir. 1986). Only clear and convincing evidence of improper motive rebuts that presumption. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234 (Fed. Cir. 2002). Indeed, Petitioner would be required "'well-nigh irrefragable proof' to induce the court to abandon the presumption of good faith dealing." Kalvar Corp. v. United States, 543 F.2d 1298, 1301-02 (Ct. Cl. 1976) (quoting Knotts v. United States, 121 F.Supp. 630, 631 (1954)). That proof has generally come in the form of evidence showing clear governmental intent to injure the opposing party. Id. Petitioner failed to establish, by a preponderance of the evidence, that ill intent existed in this case. The Court therefore finds that HUD did not violate the implied covenants of good faith or fair dealing in the Indemnification Agreement and, as a result, Petitioner's claim fails for lack of proof.

### ORDER

Based on the foregoing, Petitioner is contractually obligated to pay the alleged debt in the amount claimed by the Secretary.

The *Order* imposing the stay of referral of this matter to the U.S. Department of Treasury for administrative offset is **VACATED**. It is hereby

**ORDERED** that the Secretary is authorized to seek collection of this outstanding obligation by means of administrative offset of any federal payment due Petitioner.

SO ORDERED.

Vanessa L. Hall
Administrative Judge

---

**Review of Determination by Hearing Officers.** A motion for reconsideration of this Court's written decision, specifically stating the grounds relied upon, may be filed with the undersigned Judge of this Court within 30 days of the date of this *Decision and Order*, and shall be granted only upon a showing of good cause.