**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ASSOCIATED MORTGAGE BANKERS, INC**., ) | |
| 2395 Ocean Avenue, Suite 5,                              ) | |
| Ronkonkoma, New York 11779, on behalf of itself ) | |
| and a class of similarly-situated mortgage lenders,   ) | |
| ) | |
| Plaintiffs,                               ) | Case No. 17-CV-00075 (ESH) |
| ) | |
| v.                                                                ) | |
| ) | |
| **BEN CARSON**, in his official capacity as            ) | |
| Secretary of the U.S. Department of Housing     ) | |
| And Urban Development,                              ) | |
| 451 7th Street, S.W.,                                        ) | |
| Washington, D.C. 20410, and                         ) | |
| ) | |
| **U.S. DEPARTMENT OF HOUSING AND** ) | |
| **URBAN DEVELOPMENT**,                          ) | |
| 451 7th Street, S.W.,                                        ) | |
| Washington, D.C. 20410,                               ) | |
| ) | |
| Defendants.                            ) | |

<u>**FIRST AMENDED COMPLAINT**</u>

**INTRODUCTION**

If someone wanted to understand the public's frustration with the federal government, he

or she need only look to the Department of Housing and Urban Development's ("HUD") abysmal

conduct in disposing of the collateral for a loan originated by Plaintiff Associated Mortgage

Bankers, Inc. ("AMB").  Briefly, HUD took a property valued at $550,000 and improperly sold it

as part of a bulk sale of defaulted notes for $360,531.24 (66% of its value, or approximately

$190,000 less than the property was worth).  Because AMB had agreed to indemnify HUD for any

losses suffered in connection with the legitimate liquidation of this particular loan, HUD's

misconduct in failing properly to liquidate the collateral means that AMB must suffer the

consequences—to wit, it must pay HUD's losses in the amount of $174,918.20 plus interest accruing at the rate of 5% from February 25, 2015.

HUD's confusion over how to execute its loan sale program can be understood in part since HUD was obligated to promulgate regulations governing the program through notice and comment rulemaking, yet did not, and instead operates this program covering billions of dollars of Government assets through unclear and decentralized internal policies and procedures.

AMB filed an administrative appeal objecting to HUD's outrageous conduct. While recognizing that HUD "admitted that the [] Loan should never have been included in the [Single Family Loan Sale] Program" and that selling the Loan in this manner "was a direct violation of HUD's own [Participating Servicer Agreement]" with the servicer, the HUD Administrative Judge excused such conduct on the part of HUD and left AMB holding the bag for all of the losses. Further, the HUD Administrative Judge did not even have the authority to make the decision since she is an inferior officer, yet was not appointed to her position by the head of the department (the Secretary of HUD) as required by the U.S. Constitution. To paraphrase Oscar Wilde's barb about Queen Victoria's prisoners: If this is the way the government treats its citizens, it doesn't deserve to have any.

As it turns out, HUD has treated a number of other lenders in a similar manner. In order to stop this misconduct—the practice of giving away the collateral for loans with indemnification agreements for the price of the notes as part of a bulk sale—AMB, on behalf of itself and a class of similarly-situated lenders, brings this class action seeking declaratory and injunctive relief as well as restitution and disgorgement against defendants Ben Carson, in his official capacity as Secretary of the United States Department of Housing and Urban Development, and the United States Department of Housing and Urban Development, for violations of the Administrative

Procedure Act ("APA") (5 U.S.C. § 551, *et seq.*), the U.S. Constitution, the statue governing administrative offsets and HUD's implementing regulations on administrative offsets (31 U.S.C. § 3701, *et seq.*; 24 C.F.R. § 17.61, *et seq.*), as well as for common law breach of the covenant of good faith and fair dealing.

## PARTIES

1.     AMB is incorporated under the laws of New York, with its principal place of business in Ronkonkoma, New York.

2.     AMB originates mortgage loans, including mortgages that are and were eligible for insurance under the Federal Housing Administration ("FHA") insurance program administered by HUD.

3.     AMB is and was at all times relevant to these allegations an FHA-approved mortgagee and subject to regulation by HUD.

4.     Ben Carson is the Secretary of HUD, and he is named only in his official capacity.

5.     HUD is an agency of the United States government with its headquarters at 451 7th Street, S.W., Washington, D.C. 20410.

## JURISDICTION, VENUE, AND
## WAIVER OF SOVEREIGN IMMUNITY

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which provides district courts with original jurisdiction over all civil actions arising under the laws of the United States.

7.     Venue is proper in this Court under 28 U.S.C. § 1391, which provides that a civil action in which a defendant is an officer or agency of the United States may be brought in any judicial district in which a defendant resides.

8.      HUD's sovereign immunity with respect to this suit is waived by the Administrative

Procedure Act (5 U.S.C. § 702) and the National Housing Act (24 U.S.C. § 1702).

## FACTUAL BACKGROUND

### *FHA Mortgage Insurance*

9.      FHA was created by Congress in 1934, and became part of HUD's Office of

Housing in 1965.

10.     FHA provides mortgage insurance on loans made by FHA-approved lenders

throughout the United States and its territories.

11.     According to HUD's website, the "FHA insures mortgages on single family and

multifamily homes including manufactured homes and hospitals.  It is the largest insurer of

mortgages in the world, insuring over 38 million properties since its inception in 1934."  *See*

https://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/fhahistory (last visited Sept.

13, 2017).

12.     HUD's website states: "FHA is the only government agency that operates entirely

from its self-generated income and costs the taxpayers nothing.  The proceeds from the mortgage

insurance paid by the homeowners are captured in an account that is used to operate the program

entirely."   *See*  https://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/fhahistory

(last visited Sept. 13, 2017).

13.     The account from which FHA pays insurance claims is known as the Mutual

Mortgage Insurance Fund (the "MMI Fund").

### *FHA Insurance Claims*

14.     When loans subject to FHA mortgage insurance default, the mortgage holder or

servicer will generally foreclose on the property or obtain a deed-in-lieu of foreclosure.

15.     The mortgage holder or servicer will then generally make an insurance claim to FHA for its losses incurred in connection with the default on the mortgage and will convey title to the property to HUD in return.

16.     HUD will then generally dispose of any collateral it receives in exchange for paying an insurance claim in order to recoup its losses due to paying the insurance claim.

### *HUD's Rulemaking Requirements*

17.     As a general matter, "notice of proposed rule making shall be published in the Federal Register," including "reference to the legal authority under which the rule is proposed" and "the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b).

18.     After providing notice, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation," and "[a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose."  5 U.S.C. § 553(c).

19.     The APA provides that agencies normally do not need to engage in notice and comment rulemaking in connection with "a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts."  5 U.S.C. § 553(a)(2).

20.     However, HUD's regulations governing "Rulemaking: Policy and Procedures" provide that "[i]t is the policy of the Department of Housing and Urban Development to provide for public participation in rulemaking with respect to all HUD programs and functions, including matters that relate to public property, loans, grants, benefits, or contracts ***even though such matters***

*would not otherwise be subject to rulemaking by law* or Executive policy."  24 C.F.R. § 10.1 (emphasis added).

21.     HUD's regulations also provide that "notice and public procedure will be omitted if the Department determines in a particular case or class of cases that notice and public procedure are impracticable, unnecessary or contrary to the public interest.  In a particular case, the reasons for the determination shall be stated in the rulemaking document."  24 C.F.R. § 10.1.

### *Rulemaking on HUD's Accelerated Claims Disposition Program*

22.     In 2002, HUD began exploring a new program, known as Accelerated Claim Disposition ("ACD"), to dispose of collateral it received after paying insurance claims.

23.     The program has been called by a number of names over time, and by different names at the same time, including: Accelerated Claim Disposition; Accelerated Claim and Asset Disposition; Single Family Joint Venture Loan Sales; Single Family Loan Sales; Single Family Mortgage Acquisition and Recovery Initiative; and Distressed Asset Stabilization Program.

24.     In February 2002, HUD issued a "Notice of FHA Accelerated Claims Disposition Demonstration" (the "February 2002 Notice"), a program under which "HUD would pay accelerated claims on certain defaulted FHA-insured mortgages."  67 Fed. Reg. 5,418 (Feb. 5, 2002).

25.     The February 2002 Notice requested comments on the ACD demonstration program.

26.     In October 2002, HUD published a final "Notice of FHA Accelerated Claims Disposition Demonstration" which formally established the demonstration program (the "October 2002 Notice").  67 Fed. Reg. 66,038 (Oct. 29, 2002).

27.     With respect to which loans qualified for the program, the October 2002 Notice added a requirement that "[t]o the knowledge of the participating mortgagee, the mortgage loan is not subject to an Indemnification Agreement as of the provisional claim approval date."  67 Fed. Reg. at 66,041.

28.     HUD stated that the success of the program would be evaluated based on "whether the use of the ACD process will: (1) reduce loss rates; (2) reduce the cost and time associated with claim dispositions; and (3) enhance the ability of HUD to assess risk and manage the FHA mortgage insurance fund."  67 Fed. Reg. at 66,041.

29.     The October 2002 Notice stated that, with respect to "evaluating the success of the ACD Demonstration," "[a] summary of the results of the evaluation will be published in the Federal Register."  67 Fed. Reg. at 66,040.

30.     No "summary of the results of the evaluation" of the ACD program was published in the Federal Register.

31.     HUD conducted four sales under the ACD demonstration program, in 2002, 2003, 2004, and 2005.

32.     A brochure for the 2002 ACD sale noted that "[t]he goals of this new program are to shorten the timeframe in which servicers can file a claim for defaults; to address defaults by aligning private sector interests with HUD's objectives; to reduce HUD's REO portfolio; to increase the value of single-family assets and the recovery to HUD; and to produce savings to HUD."  *See* https://portal.hud.gov/hudportal/documents/huddoc?id=DOC_14522.pdf (last visited Sept. 13, 2017).

33.     In a 2006 "Semiannual Regulatory Agenda" (the "2006 Agenda"), HUD stated that it sought "comments on HUD's Accelerated Claim and Asset Disposition Demonstration (ACD)

program before the Department proceeds to issue a proposed rule to codify the requirements for the ACD program, making it a permanent part of HUD's single family mortgage insurance programs."  71 Fed. Reg. 22,734, 22,743 (April 24, 2006).

34.    According to the 2006 Agenda, "[t]he purpose of the ACD program is to assist FHA to maximize the recovery on assets sold by HUD."  71 Fed. Reg. at 22,743.

35.    In June 2006, HUD published an "Accelerated Claim and Asset Disposition (ACD) Program; Advance Notice of Proposed Rulemaking" in the Federal Register (the "June 2006 Proposed Rulemaking").  71 Fed. Reg. 32,392 (June 5, 2006).

36.    The June 2006 Proposed Rulemaking sought "comments on HUD's Accelerated Claim and Asset Disposition (ACD) program before HUD proceeds to issue a proposed rule that will commence the rulemaking process that will result in codification of the requirements for the ACD program, thus making the ACD program a permanent part of HUD's single family mortgage insurance programs."  71 Fed. Reg. at 32,392.

37.    According to the June 2006 Proposed Rulemaking, "[t]he purpose of the ACD program is to help FHA maximize the recovery on assets sold by HUD."  71 Fed. Reg. at 32,392.

38.    The June 2006 Proposed Rulemaking sought "comments on the ACD Demonstration program, including recommendations of cost-effective, efficient improvements and alternatives that should be made part of the permanent program."  71 Fed. Reg. at 32,392.

39.    The June 2006 Proposed Rulemaking stated that:

Before implementing the new ACD disposition process on a nationwide basis, HUD has conducted an ACD Demonstration program involving a group of defaulted mortgages.  This has allowed HUD to assess the overall effectiveness of this disposition process.  HUD believes that improvements can be made to the program to make it more effective. Consequently, before proceeding with the regulatory codification of the ACD program, HUD is soliciting comments from all interested parties . . . on possible improvements to the program.

. . .

This notice solicits comments on HUD ACD Demonstration program before HUD issues a proposed rule to codify the requirements for the ACD program. When codified, the ACD program will become a permanent part of HUD's single family mortgage insurance programs.

71 Fed. Reg. at 32,392.

40.     The June 2006 Proposed Rulemaking further stated that:

Also upon codification, the current regulations in 24 CFR part 203 governing the assignment of mortgages to HUD and related claim procedures will be amended to reflect the new requirements for assignments made pursuant to the ACD program. The proposed rule would also revise 24 CFR part 291, which governs the disposition of HUD-acquired single family property, to incorporate the policies and procedures for the sale of loans assigned to HUD under the ACD program.

71 Fed. Reg. at 32,392.

41.     The June 2006 Proposed Rulemaking stated that "[a]n objective of the ACD Program will be to maximize the return to the FHA insurance fund." 71 Fed. Reg. at 32,392.

42.     The June 2006 Proposed Rulemaking stated that "[p]ublic comments received in response to this notice will be used to develop a proposed rule that will commence the rulemaking process to codify the ACD program." 71 Fed. Reg. at 32,393.

43.     In September 2006, HUD reopened the comment period from the June 2006 Proposed Rulemaking. 71 Fed. Reg. 54,451.

44.     In March 2007, the proposed rulemaking was withdrawn. *See* https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=200704&RIN=2502-AI14 (last visited Sept. 13, 2017).

45.     HUD did not initiate a new rulemaking process to create a final rule governing the ACD program.

46.     HUD did not amend the regulations at 24 CFR part 203 and 24 CFR part 291 to reflect the impacts or changes as a result of the ACD program.

47.     HUD conducted six ACD sales, known at the time as Single Family Loan Sales ("SFLS"), between 2010 and mid-2012, despite the fact that HUD never conducted notice and comment rulemaking governing the ACD program.

### *HUD's Distressed Asset Stabilization Program*

48.     In mid-2012, HUD reorganized ACD/SFLS into the Distressed Asset Stabilization Program ("DASP").

49.     HUD did not conduct any rulemaking or publish any information with respect to DASP in the Federal Register.

50.     In an explanation of DASP issued by HUD when the program was first announced, HUD identified the purpose of DASP as helping defaulted borrowers avoid foreclosure and did not identify maximizing the return to the MMI Fund on assets sold by HUD as a purpose of DASP. Ex. 1.

51.     Between September 2012 and the present, HUD has conducted eight bulk note sales under the DASP program, though HUD still referred to these sales by the name SFLS.

52.     The bulk note sales between 2010 and the present have accounted for almost 109,000 loans with unpaid principal balances totaling $18.4 billion.

53.     DASP has come under scrutiny and criticism due to having adverse, unintended effects on communities containing properties subject to the bulk note sales. *See, e.g., Vulture Capital Hits Home – How HUD is Helping Wall Street and Hurting Our Communities*, The Center for Popular Democracy, Sept. 2014, available at: http://homesforall.org/wp-content/uploads/2014/09/HUD.DASP_.RTC_.v15.pdf (last visited Sept. 13, 2017).

54.     If ACD/SFLS/DASP had been subject to notice and comment rulemaking, commenters could have addressed or warned HUD about the potential adverse effects or

unintended consequences of its program, and HUD could have tailored a final rule to respond to any such issues.

55.     Further, if ACD/SFLS/DASP had been subject to notice and comment rulemaking, AMB and other class members could have submitted comments to HUD to ensure that loans subject to indemnification agreements were not included in the program and to ensure that the program did not conflict with HUD's obligations under its indemnification agreements.

56.     In July 2017, the HUD Office of Inspector General ("HUD OIG") released a report finding that HUD was required to conduct notice and comment rulemaking to implement the SFLS/DASP program, but had failed to do so.  Ex. 2.

57.     HUD was provided with an advance copy of the July 2017 HUD OIG Report and was allowed to respond to HUD OIG's assertions and recommendations.

58.     While HUD claimed in its response letter that the bulk note sales were "guided by a series of well documented procedures used both internally by staff and externally by stakeholders," HUD did not dispute HUD OIG's allegations that HUD had failed to conduct the requisite notice and comment rulemaking in connection with the ACD/SFLS/DASP program.  Ex. 2, at 10-11.

59.     HUD instead stated in its response letter that "[w]e concur with the recommendations" made by HUD OIG, which included a recommendation that HUD "[c]omplete the rulemaking process for HUD's single-family note sales program."  Ex. 2, at 7, 11.

### *ACD/SFLS/DASP Is Contrary to HUD's Regulations Governing Note Sales*

60.     Payment of insurance claims, assignment of collateral to HUD in exchange for payment of insurance claims, and mortgage servicing for such properties are generally covered by HUD's regulations at 24 C.F.R. § 203, Subparts B & C.

61.     HUD's disposition of mortgage notes it receives in exchange for paying insurance claims are generally governed by HUD's regulations at 24 C.F.R. § 291, Subpart D.

62.     The ACD demonstration program, which applied to note sales between 2002 and 2005, was subject to notice and comment rulemaking procedures, and could therefore operate outside of the normally-applicable HUD regulations for payment of insurance claims, assignment of collateral to HUD in exchange for payment of insurance claims, mortgage servicing for such properties, and disposition by HUD of mortgage notes it receives in exchange for paying insurance claims.

63.     Subsequent ACD/SFLS/DASP sales starting in 2010 which were not part of the ACD demonstration program were not subject to notice and comment procedures.

64.     ACD/SFLS/DASP sales which were not part of the ACD demonstration program could not legally operate outside of the requirements of HUD's regulations.

65.     The procedures and requirements of the ACD/SFLS/DASP note sales do not comport with the applicable requirements of 24 C.F.R. § 203, Subparts B & C and 24 C.F.R. § 291, Subpart D.

66.     For example, when a mortgage defaults, the mortgagee normally must first recover the collateral (*e.g.*, foreclosure, obtain a deed in lieu of foreclosure) or change the status of the mortgage (*e.g.*, forbearance, modification, refinance, assumption) before making a claim.   24 C.F.R. § 203.355.  ACD/SFLS/DASP negates this regulation.

67.     As another example, HUD normally may only accept assignment of a mortgage note (as opposed to conveyance of the property) in limited, specified circumstances.  24 C.F.R. § 203.355.  ACD/SFLS/DASP negates this regulation.

68.     As another example, the requirements HUD places on buyers and servicers after the bulk note sale are inconsistent with and more onerous than the requirements provided for under HUD's regulations.  24 C.F.R. § 291.307.

### *AMB's Indemnification Agreement with HUD*

69.     On December 10, 2012, AMB entered into an indemnification agreement with HUD in connection with a HUD audit of an individual mortgage loan originated by AMB, FHA Case No. 374-5838647 (the "Loan").  A copy of the Indemnification Agreement is attached as Exhibit A.

70.     Among other things, the Indemnification Agreement states:

> **All HUD requirements for servicing and payment of mortgage insurance premiums will be observed with respect to such mortgages**.  In the event of a **valid** claim for insurance on any of the mortgages covered by this Agreement, indemnification will be in accordance with paragraph (b), (c), (d), or (e), whichever applies.  HUD's Investment includes, but is not limited to: the full amount of the insurance claim actually paid, . . . **prorated losses from and expenses associated with the sale of a note**, . . . and any other expenses HUD may incur in connection with its claim disposition programs regarding FHA insured mortgages. To the extent HUD recoups any losses (e.g. receipts for the sale of the property) or **there is any discount on the property** (e.g., an Officer Next Door discount), HUD will deduct the amount of the recoupment or discount from HUD's Investment.
>
> . . .
>
> [Paragraph (c)] Where a HUD/FHA insurance claim has been paid in full and **the property** has been sold by HUD to a third party, the amount of indemnification is HUD's investment as defined in paragraph (a), minus the sales price of **the property** to be paid in accordance with the terms of an invoice or bill the Department sends to the mortgagee. . . .
>
> [Paragraph (d)] In any other case where a HUD/FHA insurance claim **is pending or has been paid**, the mortgagee shall pay HUD the amount of HUD's Investment in accordance with the terms of an invoice or bill the Department sends to the mortgagee.

Ex. 3, at 1 (emphasis added).

71.     Attached to the Indemnification Agreement was a list of "Mortgages Covered By This Indemnification Agreement," which included the Loan.  Ex. 3, at 2.

72.     The attachment page also had a second section stating: "Of the mortgages covered by this indemnification agreement, the Department is aware that the following mortgages have a *claim pending*," and also listed the "Known Claim Amount."  Ex. 3, at 2 (emphasis added).

73.     The Loan was not identified as having a "claim pending" when the Indemnification Agreement was signed in 2012.  Ex. 3, at 2.

### *Sale of the Note Underlying the Loan*

74.     Loans which are subject to indemnification agreements are not supposed to be sold as part of the SFLS bulk note sales.

75.     The SFLS Program was designed to, among other things, reduce HUD's timelines for carrying costs of properties and limit HUD's losses.

76.     Here, because HUD had an indemnification agreement from AMB on the Loan, HUD was not at a risk of loss on the Loan because of any delayed or extended timelines.

77.     Unbeknownst to AMB, and contrary to existing HUD regulations, HUD sold the note that was secured by the collateral for the Loan through the SFLS program.

78.     HUD requires the servicer for a loan subject to an SFLS sale to obtain a broker price opinion for the property underlying the loan in advance of the sale

79.     Prior to the sale, the servicer determined that the value of the property underlying the Loan was $550,000, as of April 21, 2013.

80.     AMB obtained a valuation of the property underlying the Loan on September 13, 2013 which placed its value at $530,100.

81.     At the time of the SFLS sale, the Loan had an unpaid principal balance of less than $475,000.00.

82.     At the time of the SFLS sale, the value of the property underlying the Loan was greater than the unpaid principal balance, such that a sale of the property at the value as determined in the broker price opinion would have covered the defaulted loan balance.

83.     The specific bulk sale which contained the Loan was known as Pool 105 of SFLS 2013-2.

84.     Pool 105 contained 2,278 notes.

85.     The total broker price opinion for all properties whose notes were sold in Pool 105 was $271,330,088.00.

86.     The total unpaid principal balance for all loans in Pool 105 was $337,421,021.43.

87.     On average, the values of the properties in Pool 105 were less than the unpaid principal balances of the note underlying the properties, such that on average sales of the properties would not have covered the defaulted loan balance.

88.     Because the property underlying the Loan was worth more than the unpaid principal on the Loan, it was worth significantly more as compared, on average, to the other notes in Pool 105, where the properties were worth less than the unpaid principal.

89.     The successful bidder for Pool 105 is identified as "SRMOF II 2012-1 Trust."

90.     HUD requires bidders to submit bids expressed as a percentage of the unpaid principal balance to be paid for each mortgage loan.

91.     According to HUD, the purported sales price for a particular note is the result of multiplying the unpaid principal balance for that loan by the bid percentage.

92.     Pool 105 was sold to the highest bidder for the entire pool, which in the case of the Loan resulted in a sales price of $360,531.24 or approximately 66% of the property's value.

93.     Since the note for the Loan was sold to the highest bidder for the entire pool, it was not necessarily sold to highest bidder for that note.

94.     The property underlying the loan was occupied by a renter around the time of the sale, such that inclusion of the Loan in the SFLS program did not fulfill DASP's stated purpose of keeping borrowers in their homes.  Ex. 4, at 3.

### *The Note Was Not Sold at Market Value or to Maximize Value*

95.     Notes sold as part of SFLS bulk sales are subject to conditions and restrictions which are not normally present in open-market sales.

96.      As HUD explains on its website, "[t]he loans sold contain specified representations and warranties and may be sold with post-sale restrictions and/or reporting requirements."  *See* http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/comp/asset/sfam/sfls     (last visited Sept. 13, 2017).

97.     Bidders for SFLS 2013-2 (which included the note underlying the Loan) were required, among other provisions, to:

> a.      Be a company, trust, or other type of business entity with a net worth of at least $5,000,000;

> b.      Be in the business of buying, originating, or selling mortgage loans or similar assets in the ordinary course of business; and

> c.      Be able to bear the risk of a complete loss of the economic value of the notes they purchases as part of the bulk sale.

Ex. 5, at 3-4 (SFLS 2013-2 Qualification Statement).

16

98.     HUD maintained the right to, "in its sole discretion, refuse to qualify any prospective bidder who, in FHA/HUD's sole judgment, does not have the requisite knowledge and experience to evaluate the merits and risks of purchasing and to make an informed decision with respect to the purchase of the Mortgage Loans."  Ex. 5, at 7.

99.     Further, the bidder for a pool had to be able and willing to purchase a large number of assets (*e.g.*, thousands of mortgage notes), and purchasers interested in an individual property, such as the property that is the collateral for the Loan, were excluded from bidding.

100.    The program imposes post-sale restrictions on the property, which include allowing the original borrower to remain in residence for at least six months or one year (depending on when the sale occurred) while evaluating a second round of loss mitigation options.

101.    Borrowers whose loans were subject to the bulk sale had already failed to avoid default during an initial rounds of loss mitigation procedures which was mandated by statute and regulation.

102.    All mortgage loans purchased through the bulk sales must be serviced by a HUD-approved mortgage servicer for the remaining life of the mortgage loan, and a purchaser that is not a HUD-approved mortgage servicer must retain a HUD-approved mortgage servicer to service the mortgage loans.

103.    The restrictions on who could bid, and the post-purchase restrictions on what could be done with the properties, resulted in a reduction in the sales price compared to what HUD could have obtained if it had sold the collateral on the open market or had sought to maximize value.

### *Mortgage Servicing and Insurance Claims for SFLS Mortgages*

104.    To become a HUD-approved mortgage servicer for SFLS loans, the servicer must enter into a Participating Servicer Agreement ("PSA") with HUD.

105.    JPMorgan Chase Bank, N.A. ("JPMorgan") entered into a PSA with HUD in connection with SFLS 2013-2, the sale which covered the note securing the Loan.  Ex. 6 (PSA between HUD and JPMorgan for SFLS 2013-2).

106.    Under the PSA, HUD only needs to pay an insurance claim for an "Eligible Mortgage Loan."  Ex. 6, at 9.

107.    "Eligible Mortgage Loan" is defined, in relevant part, as "a single-family mortgage loan which meets all of the following requirements as of the date of SFLS Claim Submission Report-A (unless explicitly excepted), and continues to meet all such requirements as of the Claim Submission Date: . . . (h) the Mortgage Loan is not subject to an Indemnification Agreement."  Ex. 6, at 9.

108.    With respect to "Filing and Payment of Insurance Claims," the PSA provides:

> The Participating Servicer shall review its entire portfolio of FHA insured loans and, for each *Eligible Mortgage Loan* that the Participating Servicer intends to submit as an Insurance Claim, obtain a [risk score] prior to the submission of the initial SFLS claim submission report ("SFLS Claim Submission Report-A"). [Then] Participating Servicer shall submit SFLS Claim Submission Report-A to HUD with a list of *Eligible Mortgage Loans* it intends to submit as Insurance Claims.  All of the information required for the SFLS Claim Submission Report, including the submission procedures and the data format for the list of *Eligible Mortgage Loans* submitted and the Participating Servicer Program Eligibility Certification is set forth in Appendix 3 to the Desk Guide.

Ex. 6 § 2.01 (emphasis added).

109.  Next:

> [A]fter Participating Servicer's submission of the SFLS Claim Submission Report pursuant to Section 2.01, the list of *Eligible Mortgage Loans* shall be updated on FHA's claim processing system ("FHA System") to allow for claim payment, and HUD will advise Participating Servicer of those *Eligible Mortgage Loans* designated in the FHA System with an SFLS Claim Identification Date by electronic transmittal of an SFLS claim identification report ("SFLS Claim Identification Report") to Participating Servicer.  HUD's identification process will be used only to identify mortgage loans submitted as potential SFLS Claims by Participating Servicers and not to screen mortgage loans for eligibility, *with the exception of mortgage loans subject to an Indemnification Agreement*.  Without

limiting Participating Servicer's obligations in Section 4.0l(b), **HUD will not issue an SFLS Claim Identification Date for any mortgage loans for which Indemnification Agreements are identified on HUD's system of records**.

For **Eligible Mortgage Loans** that received a SFLS Claim Identification Date, the cut-off date for submission of a claim is no later than August 30, 2013.  In the event, after an SFLS Claim Identification Date is issued, a mortgage loan **is not or has failed to continue to be an Eligible Mortgage Loan, Participating Servicer shall not submit a claim on such mortgage loan**.

Ex. 6 § 2.02 (emphasis added).

110.    Finally, "[a]n Insurance Claim may be submitted by Participating Servicer for any **Eligible Mortgage Loan** provided that the Participating Servicer has received an SFLS Claim Identification Date prior to submission of an SFLS Claim with respect thereto."  Ex. 6 § 2.03 (emphasis added).

### *No Valid Insurance Claim on the Loan*

111.    HUD tracks information about FHA-insured loans in a software program known as Neighborhood Watch.

112.    Both HUD and JPMorgan had access to information about the Loan in Neighborhood Watch.

113.    Since the Indemnification Agreement between HUD and AMB was signed in December 2012, the Loan was not an "Eligible Mortgage Loan" for purposes of making an insurance claim under the PSA by 2013.

114.    JPMorgan made an insurance claim on the Loan on August 6, 2013, for $520,979.86.

115.    The Loan was identified in Neighborhood Watch as being subject to an Indemnification Agreement.  Ex. 4, at 3.

116.    HUD failed to screen out the Loan as ineligible for an insurance claim due to the presence of the Indemnification Agreement.

117.   HUD paid the insurance claim of $520,979.86 to JPMorgan on August 10, 2013.

118.   Since JPMorgan was barred from making the insurance claim due to the Loan not being an "Eligible Mortgage Loan," the claim for insurance was not valid.

119.   HUD was not obligated the pay a non-valid claim for insurance.

120.   The Indemnification Agreement required that "[a]ll HUD requirements for servicing . . . will be observed with respect to" the Loan.

121.   The prohibition on making an insurance claim for indemnified loans was a requirement for servicing with respect to the Loan.

122.   The Indemnification Agreement only requires AMB to identify HUD for losses paid on a "valid insurance claim," Ex. 3, at 1, such that AMB is not required to indemnify HUD in connection with the Loan.

### *HUD Sold the Note at a Discount*

123.   HUD has regularly stated that notes sold as part of the SFLS bulk sales were sold at a discount.

124.   For example, in a report on the bulk note sale program, HUD repeatedly stated that it sold the notes that were part of the program "at a discounted price" and at a "discount."  Ex. 7, at ii, iii, 1, 3, 11, 18.

125.   As another example, in a different report, HUD OIG stated that HUD "sells the note to a joint venture at a discounted price."  Ex. 8, at 5.

126.   As another example, a HUD press release announcing DASP stated that "[t]he investor purchases the loan at a discount."  Ex. 9, at 1.

127.     The property underlying the Loan had a value of $550,000 pursuant to a valuation HUD required the mortgage servicer to obtain on the property as a precondition to including it in the bulk note sale.

128.     HUD sold the note for $360,531.24 or approximately 66% of the property's value.

129.     Under the Indemnification Agreement, "[t]o the extent HUD recoups any losses (e.g. receipts for the sale of the property) or there is any discount on the property (e.g., an Officer Next Door discount), HUD will deduct the amount of the recoupment or discount from HUD's Investment."

130.     The term "*e.g.*" is a an abbreviation for the Latin phrase "*exempli gratia*," which means "for the sake of example" or "for example," and is used to introduce representative, non-exclusive examples of something.

131.     While the Indemnifications Agreement states that the Officer Next Door program is one example of a "discount," that does not mean that it is the only type of program treated as a discount under the Indemnification Agreement.

132.     HUD did not deduct the amount of the discount resulting from the bulk note sale from what it claims AMB owes under the Indemnification Agreement.

### *The Indemnification Agreement Required HUD to Sell the Property Instead of the Note*

133.     An indemnitee, like HUD, is obligated to reasonably mitigate its damages, and an indemnitor, like AMB, is not responsible to pay for damages which could have been mitigated.

134.     The Indemnification Agreement discussed several scenarios of how HUD could liquidate the collateral it received for paying the insurance claim in order to recoup its loss.

135.    Under the circumstances of this case, HUD was obligated to sell the property underlying the Loan instead of just the note in a bulk note sale which was not permitted under existing HUD regulations.

136.    A provision of the contract which could have allowed HUD to sell just the note was inapplicable since it only applied to insurance claims which were pending or paid at the time the parties entered into the Indemnification Agreement, which was not the case here.

137.    Alternatively, to the extent HUD was allowed to sell the note in a bulk sale—which it was not—HUD was required to "prorate[] losses from and expenses associated with the sale of the note."  Ex. 3, at 1.

138.    HUD did not prorate its losses on the sale of the note notwithstanding the fact that it sold the note at an admitted discount.

### *HUD Seeks Indemnification from AMB*

139.    HUD did not seek to collect under the Indemnification Agreement with AMB after it paid the claim in August 2013.

140.    During or before mid-July 2014, the HUD OIG informed HUD that HUD OIG believed HUD had failed to collect under indemnification agreements related to loans which were sold as part of the SFLS program and for which an insurance claim was made.  Ex. 8.

141.    The HUD OIG Report did not discuss the fact that loans which were subject to indemnification agreements were not supposed to be part of the SFLS program, or that HUD was not supposed to pay insurance claims for indemnified loans subject to the SFLS program.

142.    HUD informed HUD OIG on July 24, 2014, that it would begin trying to collect alleged losses for indemnified loans which were sold as part of the SFLS program.  Ex. 8, at 20.

143.    HUD did not inform HUD OIG that it was HUD's responsibility to screen the pools of loans to remove those loans with indemnification agreements from the pool.

144.    HUD also did not inform HUD OIG that HUD was not required to pay insurance claims on such loans.

145.    On July 28, 2014, as a result of the HUD OIG's prompting, HUD sent AMB a Demand Notice for $160,448.62, the difference between what HUD paid for the insurance claim and what it received from the note sale for the Loan.

146.    AMB sought more information from HUD regarding the note sale in connection with the Loan and why a loan subject to an indemnification agreement had been included in the SFLS sale, notwithstanding HUD's policy that such loans should not be included.

147.    On October 13, 2014, HUD issued a Notice of Intent to Collect by Treasury Offset for the alleged amount owed of $161,897.31 (the amount owed had accrued alleged interest).

148.    In a December 2014 letter between HUD and AMB regarding the alleged amount owed, HUD admitted that it "acknowledges that the indemnified loan was erroneously included in the Single Family Loan Sale (SFLS) Program," but still demanded payment.  Ex. 10.

149.    In the December 2014 letter, HUD claimed that inclusion of the Loan in the SFLS program "did not impact on the legal enforceability of the Indemnification Agreement," but did not proffer any basis for the assertion, nor attempt to explain why HUD used a sales process which recovered only 66% of the value of the underlying property for an intentional loss.  Ex. 10.

### *HUD Attempts to Collect by Administrative Offset*

150.    Treasury offset, also known as administrative offset, is a procedure in which the Government recoups money it is allegedly owed by withholding money which belongs to the

alleged debtor that is in the Government's possession or which the Government is otherwise obligated to pay to the alleged debtor.  31 U.S.C. § 3716.

151.    When HUD seeks to collect a debt through administrative offset, it must provide "an opportunity for a review within the agency of the decision of the agency related to the claim." 31 U.S.C. § 3716(a)(3).

152.    Under HUD regulations, an alleged debtor "who receives notice of intent to offset . . . has the right to a review of the case and to present evidence that all or part of the debt is not past due or not legally enforceable."  24 C.F.R. § 17.69(a).

153.    The administrative proceeding is presided over by a HUD Administrative Judge.

154.    "The decision of an administrative judge of the [HUD Office of Appeals] will be based on a preponderance of the evidence as to whether there is a debt that is past due and whether it is legally enforceable."  24 C.F.R. § 17.69(c).

155.    "The decision of the administrative judge of the [HUD Office of Appeals] concerning whether a debt or part of a debt is past due and legally enforceable is the final agency decision with respect to the past due status and enforceability of the debt."  24 C.F.R. § 17.73(a).

156.    In normal situations where one entity alleges that another entity owes it money, the alleged creditor is generally required to file a court case and obtain a judicial judgment that the alleged debtor owes the money.

157.    The alleged creditor can then collect the money owed through the court's judgment.

158.    With administrative offset, HUD is able to short-circuit the normal requirement of going to court and obtaining a court judgment before it can begin collecting money which it is allegedly owed.

### _HUD Administrative Judges are Inferior Officers_

24

159.    Proceedings to determine whether a debt is owed and past due for purposes of administrative offset are heard by a HUD Administrative Judge.

160.    HUD Administrative Judges are not the same thing as Administrative Law Judges ("ALJs"), and are instead akin to agency hearings officers.

161.    HUD Administrative Judges exercise power over significant matters, including the ability to allow HUD to bypass the need to obtain a court judgment that it is owed money before collecting a disputed debt.

162.    HUD Administrative Judges have significant discretion in hearing cases before them and deciding the outcome of proceedings, akin to that exercised by a judge in a court proceeding.

163.    Decisions by HUD Administrative Judges that a debt is past due and legally enforceable, such that the Government may collect it by administrative offset, is "the final agency decision" under HUD regulations and is not subject to further review by the Secretary of HUD.

164.    Upon information and belief, HUD Administrative Judges are not appointed by the head of their department (here, the Secretary of HUD).

165.    Upon information and belief, HUD Administrative Judges are civil service employees subject to merit based hiring and firing procedures.

166.    HUD Administrative Judges are not appointed by the head of the department as required by the U.S. Constitution's Appointments clause.  U.S. Const. Art. II § 2, cl. 2.

### ***Proceedings Before HUD Administrative Judge***

167.    On December 17, 2014, AMB filed a timely agency appeal with HUD's Office of Hearings and Appeals of HUD's decision to seek administrative offset.

168.     On December 17, 2014, the Administrative Judge assigned to the case issued a stay of the administrative offset pending a final decision on AMB's appeal.

169.     After an administrative process that lasted almost exactly two years, the HUD Administrative Judge issued her Decision and Order (the "Decision") on December 16, 2016.  Ex. 11 (Decision and Order).

170.     The HUD Administrative Judge found the debt to be legally enforceable against AMB and vacated the prior stay of HUD's collection by administrative offset.

171.     In her decision, the Administrative Judge incorrectly determined that the Indemnification Agreement provided HUD unfettered discretion to ignore the plain language of the Agreement regarding the sale of the property to a third party.  Ex. 11, at 5.

172.     The Administrative Judge did recognize, however, that had HUD sold the property to a third party, "the market value of the property is a relevant consideration."  Ex. 11, at 5.

173.     The Administrative Judge's reasoning is fundamentally flawed because, among other things, she ignored the plain language of the Indemnification Agreement and she repeatedly confused the value of the debt, *i.e.*, the note, with the value of the collateral, *i.e.*, the house.  Ex. 11, at 6-7 (citing the Secretary's Second Supplemental Statement for the proposition that the "loans" sold through the SFLS Program "are competitively bid, and thus represent the loan's current market value").

174.     Because HUD is selling the notes, and not the underlying collateral that secures repayment of the note, bidders have no incentive to bid in an amount in excess of the outstanding debt.

175.     The Administrative Judge improperly rejected the other arguments presented by AMB including the fact that:  1) HUD never intended to sell the note for the Loan in the SFLS; 2)

HUD completely abdicated its responsibilities by not screening the list of loans to determine the existence of an indemnification agreement despite the fact that it recognized the need to perform such screening; and 3) the structure of the SFLS necessarily results in lower prices paid for notes, thereby unfairly increasing HUD's losses on loans with indemnification agreements.

176.     The Administrative Judge also made the unsupported finding that there is no "statute, regulation, or published HUD guidance that speaks to the issues raised by [AMB]," yet, there was no statement by HUD to support such a conclusion.  Ex. 11.

177.     Rather, HUD repeatedly refused to disclose the existence of any internal guidance regarding its screening process or even the basis for its inclusion of the screening provision in its Participating Servicer Agreements.

178.     The HUD Administrative Judge's Decision that the debt was due and enforceable, and that it could be collected by administrative offset, was arbitrary and capricious, contrary to law, and was not based on substantial evidence.

### *Harm to AMB and Class Members*

179.     HUD's failure to properly screen the mortgage loans that the servicer has included in the bulk note sale is inexcusable and resulted in serious damage to AMB and the putative class.

180.     Among other things, by selling the Loan, as well as other loans subject to indemnification agreements, as part of the SFLS program, HUD breached the terms of the indemnification agreements it executed with lenders.

181.     The indemnification agreements contemplate that HUD will exercise reasonable business judgment in liquidating the collateral, which generally requires sale of the collateral that maximizes its value and minimizes HUD's loss.

182.     The indemnification agreements also contemplated that HUD would follow existing regulations, which HUD did not do because the SFLS program was not authorized under HUD regulations.

183.     Pursuant to the terms of the Indemnification Agreement, HUD was required to sell the collateral, *i.e.,* the home, and then seek recovery for its losses, if any remained, from AMB.

184.     Instead, HUD sold the note for the Loan as part of a pool in a process that necessarily reduced the amount of HUD's recovery by excluding potential bidders and placing non-standard restrictions and conditions on the note buyer's handling of the loan after the sale.

185.     HUD's reckless and intentional disregard of its obligations and its own rules caused financial injury to AMB, as well as to other lenders, and the agency's conduct was arbitrary, capricious, and contrary to law.

## CLASS ALLEGATIONS

186.     AMB seeks to represent a class of mortgage lenders (the "Lender Class") who executed indemnification agreements on loans that were improperly included in the ACD program either through the SFLS or some other accelerated disposition program.

187.     HUD's complete failure to properly screen the loans identified by servicers to remove those loans with indemnification agreements was widespread.

188.     On August 8, 2014, HUD OIG issued a Report of its audit of HUD's indemnification recovery process for single-family loans.  HUD OIG determined that there were "243 loans that were part of the ACD program from January 1, 2004, to February 21, 2014, that had indemnification agreements; however, HUD did not evaluate any of these loans for billing." Ex. 8, at 5.  According to the Report, the losses on those loans exceeded $22 million.

189.     The HUD OIG Report specifically identifies the Loan, FHA Case No. 374-5838647, as one of the loans for which HUD had not "billed" the lender because the loan was sold through the ACD program.  Ex. 8, at 29.

190.     The fact that the HUD OIG conducted the audit and admonished HUD's Office of Finance and Budget for its failure to seek recovery in those situations where HUD sold the loan through an SFLS explains why HUD did not seek recovery from AMB until July 2014 when, in fact, the Agency sold the note in or around September 2013.

191.     HUD's failure to exclude the indemnified loan from the SFLS program, and HUD OIG's lack of knowledge that indemnified loans were supposed to be excluded from the SFLS program, stems in part from HUD's failure to adopt a clear, unified, final rule governing the SFLS program.

192.     In a July 2017 HUD OIG Report, HUD OIG criticized HUD for failing to have or adopt a unified, final regulation setting forth the policies, procedures, and rules with respect to implementation of the SFLS program.  Ex. 2.

193.     The July 2017 HUD OIG Report also found that HUD had failed to use notice and comment rulemaking procedures before adopting policies and procedures governing the SFLS program, a point which HUD did not dispute when given an opportunity to respond to an advance copy of the Report.  Ex. 2, at 10-11.

194.     If HUD had adopted a valid regulation and had a clear, unified set of policies, procedures, and rules with respect to implementation of the SFLS program, HUD and HUD OIG would likely have been aware earlier that loans subject to indemnification agreements were not supposed to be part of the SFLS program.

195.    On information and belief, members of the Lender Class received a Notice of Intent to Collect by Treasury Offset substantially identical in form to the one sent to AMB.

196.    HUD did not alert the Lender Class that HUD breached its own policies and regulations regarding the disposition of the loans.

197.    The Lender Class has no way of uncovering HUD's reckless and/or willful disregard of its own policies unless they individually undertook their own substantial investigation.

198.    The members of the Lender Class have been injured to the same extent as AMB, to wit, the amount of purported debt each class member purportedly owes HUD has been significantly increased because HUD violated its own procedures by including loans in SFLS that were subject to indemnification agreements, and violated its own regulations by selling notes in the ACD/SFLS/DASP bulk sales.

199.    Upon information and belief, some members of the Lender Class have paid the amounts demanded by HUD.

200.    Upon information and belief, payments under the indemnification agreements with HUD are placed in the MMI Fund and are not placed in the U.S. Treasury.

201.    HUD's conduct towards the Lender Class was identical, and each member of the Lender Class was harmed in an identical fashion; thus, this case is amendable to class treatment pursuant to Rule 23, Fed. R. Civ. P.

202.    Pursuant to Rules 23 (a) and 23(b)(1)-(3), AMB seeks certification of the following class:

> All mortgage lenders who executed an indemnification agreement with HUD in connection with one or more loans and where the loans were subsequently included in an SFLS or other ACD at any time prior to final judgment in this action.

203.    AMB will adequately represent the interest of the Lender Class.

## COUNT I

### Violation of the Administrative Procedure Act

204.    AMB incorporates the allegations in the entirety of this Amended Complaint as if fully stated herein.

205.    HUD was required to promulgate rules for implementation of the ACD/SFLS/DASP program through notice and comment rulemaking.

206.    HUD failed to promulgate rules governing the ACD/SFLS/DASP program through notice and comment rulemaking.

207.    If HUD believed it was not required to use notice and comment to promulgate rules governing the ACD/SFLS/DASP program, it failed to provide reasons as to why it may have believed it was not required to create rules using notice and comment rule making procedures.

208.    HUD's actions have caused and will continue to cause irreparable harm to AMB and other mortgage lenders who have executed indemnification agreements with HUD.

## COUNT II

### Violation of the Administrative Procedure Act

209.    AMB incorporates the allegations in the entirety of this Amended Complaint as if fully stated herein.

210.    The Administrative Judge's Decision is a final agency action.

211.    The Decision is arbitrary, capricious, and contrary to law because HUD did not have the legal authority to sell the Loan as part of the SFLS program since the program was contrary to HUD's regulations.

212.    The Decision is arbitrary, capricious, and contrary to law because HUD failed to exclude the Loan from the SFLS contrary to its own requirements.

213.   The decision is arbitrary, capricious, and contrary to law because it fails to acknowledge that HUD willfully or recklessly disregarded its own policies and procedures by allowing loans with indemnification agreements to be included in the SFLS.

214.   The decision is arbitrary, capricious, and contrary to law because the Indemnification Agreement does not require AMB to indemnify HUD for the invalid claim in this case; because it did not properly discount the alleged amount AMB owes as required under the Indemnification Agreement; and because HUD acted contrary to the requirements of the Indemnification Agreement which excused AMB's obligations to pay.

215.   The Decision was contrary to and violated the statue and HUD's regulations governing administrative offset.

216.    HUD's actions have caused and will continue to cause irreparable harm to AMB and other mortgage lenders who have executed indemnification agreements with HUD.

## COUNT III

## Violation of U.S. Constitution and 31 U.S.C. § 3716

217.   AMB incorporates the allegations in the entirety of this Amended Complaint as if fully stated herein.

218.   HUD was required to provide AMB with an opportunity for review within the agency of its decision to seek administrative offset, including whether the alleged debt was due and enforceable.

219.   HUD Administrative Judges exercise power over significant matters; exercise a high degree of discretion; and make final decisions which are not subject to review by the head of the agency.

220.   HUD Administrative Judges are "inferior officers" as that term is used in the

Appointments Clause of the U.S. Constitution.

221.    HUD's review of the administrative offset decision was conduct by an inferior officer who was not appointed by the head of the department, contrary to the U.S. Constitution.

222.    The HUD Administrative Judge's decision was void and was made contrary to the requirements of the U.S. Constitution's Appointment Clause.

223.    HUD violated the statute governing administrative offsets by failing to provide review by a person within the Agency who was legally allowed to do so, as the HUD Administrative Judge in this case was exercising unconstitutional authority.

224.    HUD's use of persons exercising unconstitutional authority to review administrative offset decisions has caused and will continue to cause irreparable harm to AMB and other mortgage lenders who have executed indemnification agreements with HUD.

**COUNT IV**

**Breach of the Covenant of Good Faith and Fair Dealing**

225.    AMB incorporates the allegations in the entirety of this Amended Complaint as if fully stated herein.

226.    The Indemnification Agreement is a contract between HUD and AMB.

227.    There is a duty of good faith and fair dealing implied in every contract.

228.    It is not necessary to breach an express contractual provision in order to breach the implied duty of good faith and fair dealing.

229.    A party to a contract—including the Government—must do everything that the contract presupposes should be done to accomplish the contract's purpose so as to not destroy the reasonable expectations of the other party regarding the fruits of the contract.

230.    HUD breached its implied duty of good faith and fair dealing through a reckless

and willful disregard of its obligations and the harm which would come to AMB due to HUD's actions.

231.    HUD's breaches of its implied duty of good faith and fair dealing have caused and will continue to cause irreparable harm to AMB and other mortgage lenders who have executed indemnification agreements with HUD.

## PRAYER FOR RELIEF

232.    WHEREFORE, AMB respectfully requests that this Court:

a.    Set aside the Decision, and declare that the Decision was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of 5 U.S.C. § 706;

b.    Hold that the Decision was void due to the HUD Administrative Judge's exercise of the power of an inferior officer contrary to the requirements of the U.S. Constitution for the appointment of inferior officers;

c.    Declare that HUD violated the Indemnification Agreement that was executed in connection with the Loan, FHA Case No. 374-5838647;

d.    Enjoin HUD from issuing any administrative offset or referring the debt to Treasury for collection;

e.    Certify this matter as a class action;

f.    Issue a preliminary injunction restraining HUD, its officers, employees, agents, or servants from taking any actions against AMB, or the Lender Class, with respect to loans where there was an existing indemnification agreement in place and HUD subsequently included the loan in an ACD/SFLS/DASP sale;

g.    Return funds improperly collected by HUD pursuant to indemnification

agreements which are held in the MMI Fund;

h.   Award AMB its attorney's fees and expenses incurred in this action; and

i.   Grant such other relief as the Court deems just and proper.

Dated: September 15, 2017

  /s/ David M. Souders
David M. Souders (Bar No. 441491)
Brian M. Serafin (Bar No. 996019)
WEINER BRODSKY KIDER PC
1300 19th Street NW, Fifth Floor
Washington, DC 20036
Tel:  (202) 628-2000
Fax:  (202) 628-2011
Email: souders@thewbkfirm.com
       serafin@thewbkfirm.com

**_Counsel for Plaintiff and the class of similarly situated mortgage lenders_**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 15, 2017, a copy of the foregoing **FIRST AMENDED COMPLAINT** with accompanying exhibits was filed via the Court's CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.


  /s/ *Brian M. Serafin*

Brian M. Serafin (Bar No. 996019)